Counsel, we understand you're pro bono, so we thank you for your service to the court and to your client. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Calvin Winder on behalf of the appellant, Andante Lamont-Goldsby. Mr. Lamont-Goldsby is a middle-aged African-American man who made a big mistake. He was arrested, convicted, and sentenced to six years for a felony DUI. As part of that, the judge, Judge Gibler, retained jurisdiction and put him into a therapeutic community program at Northern Idaho Institutional Correctional Institution. I'll refer to that as NICI. As part of that, there was going to be a period of time where Mr. Lamont-Goldsby would be able to undergo some therapeutic programming and hopefully show himself worthy of being put back into the community early. Unfortunately, when he got to NICI, he encountered racially discriminatory and retaliatory actions by some of the prison officials that resulted in his being terminated from the TC program. And eventually, the actions also led to Judge Gibler relinquishing jurisdiction and executing the initial sentence. Though it was modified for the, initially it was a three-year fixed term, it became a one-and-a-half-year fixed term. In this case, there's two primary questions. The district court below had entered summary judgment against Mr. Lamont-Goldsby, finding that on his 14th Amendment claim it was barred by the Supreme Court's decision, Heck v. Humphrey, and that to the extent that the First Amendment claim was not barred by Heck, it would be barred by the PLRA's exhaustion requirement. So the questions here are, does Heck bar his claims? And correspondingly, if it does not, does the PLRA's exhaustion requirement? The answer to both those questions is no, and there's two keys to this appeal today. The first key is this Court's 2016 en banc decision in Nettles v. Grounds. In Nettles, this Court decided or determined two key things for this appeal. First, if a claim does not fall within the core of habeas, as defined in Heck and some of the other Supreme Court jurisprudence, then it must be brought under Section 1983, as Mr. Lamont-Goldsby did in this case. And the second point there is the principle that where there is discretion, and as here, where the prison official's actions were not a necessary component of the State Court judge's decision to relinquish jurisdiction, that means that it does not necessarily imply the invalidity of the conviction or the sentence. The second key that I'll address today is that when the District Court determined that Mr. Lamont-Goldsby had not satisfied the PLRA's exhaustion requirement, it failed to take into account the fact that there were certain actions that occurred after May 22nd of 2013 that also were racially discriminatory and retaliatory, most noteworthy of which was the actual termination itself, and then providing the recommendation to Judge Gibler that Mr. Lamont-Goldsby's rider program be terminated and jurisdiction be relinquished. Counsel, at least for my purposes, I can't speak for my colleagues. I don't see a particular heck problem here, but I do see an exhaustion problem under the PLRA. And in particular, it seemed to me, looking at the pleadings, that your client had waived reliance on the actions of, I want to make certain I say these right, Cashmitter and McPeter between May 22nd and June 22nd, 2013. If that's right, are there any incidents that were properly exhausted and properly alleged as the basis of your client's First and Fourteenth Amendment claims? Was I clear? Do you want me to repeat that? I'm clear. Well, I believe what you said was that he's waived anything that would have happened between May 22nd and June 22nd. Is that correct? As I understand it, he's waived reliance on the actions taken by Cashmitter and McPeter between May 22nd and June 22nd. Is that incorrect or correct? That, I would say, is not correct. Not correct. And why is that? That is not correct because that would still fall within the time period when Mr. Lamont-Goldsby, essentially he would have still had time to grieve things that happened between that period of time. Before we get to that, let's get to whether he waived reliance on the actions of these two people in that one month period. Okay. Did that happen? I don't believe so. Okay. And what are you relying on for that? I guess I'm not sure, Your Honor, where you believe that the waiver came in. My understanding is that this was talked about before the tribunal and that basically nothing was pursued on that. So not having raised it, I assume it was waived. I don't think that it wasn't pursued. In his complaint, some of the specific things that he mentions as the basis for his claim is the fact that, you know, that they had impeded his ability to progress in the program, they terminated from the program, and then they took actions to get Judge Gibler to relinquish jurisdiction. And I think that all of those things did occur after that May 22nd date up through the termination. Okay. Well, I guess my concern is, you know, you've got a 30-day period to grieve. Yes. And if they didn't occur in this one-month period, then you've got a timing problem, right? If they happened before May 22nd, there would be a timing problem. And I would agree. So anything prior to May 22nd, you acknowledge there's a timing problem? I acknowledge that there's a timing problem as far as pursuing those discrete incidents. Okay. How about prior to June 22nd? Prior to June 22nd, as long as the actions occurred after May 22nd, any of that he would be able to rely on as the basis of his 1983 claim. Before… But didn't he need to file something within 30 days after June 22nd? He did. And did he? He did not. So why aren't those—why is not that claim barred? Okay. So on June 22nd, when he was terminated, he was immediately taken out of the normal unit, as my understanding, and was deprived of his paperwork, deprived of access to the concern forms, grievance forms, et cetera. And then he was transferred to the Kootenai County Jail as part of the process of going before Judge Gibler to determine whether or not he would be revoked from the rider program and jurisdiction relinquished. So in the district… I don't mean to interfere, but I want to be sure I understand your answer to my colleague's question. It sounds to me like you're saying there's an excuse for why he didn't file. That's correct. But you are agreeing he didn't file, right? That is correct, Your Honor. Yes. And what's the excuse that he didn't file? What is the excuse that he did not file? Is that correct? That's what I'm asking. Okay. I wanted to make sure that I understood the question. The excuse is that he did not have an available remedy. And he did not have an available remedy because he was taken out of a position where he could have access to the grievance system. By taking him out away from grievance forms, by putting him into the Kootenai County Jail, he no longer had access to concern forms, grievance forms. And I guess that's where my question is going. You agree, or don't you, that paralegal was available on a weekly basis to Mr. Goldsby at the IDOC-RDU? I agree with that statement, but it was not in the Kootenai County Jail. So that would have occurred after he was transferred sometime after August 13th of 2013 from the Kootenai County Jail after jurisdiction was relinquished, and he again went into IDOC custody. And that would have been outside the 30-day window. So even if he had done something at that time, it would have been outside the 30 days at that point. So where was the paralegal, just to clarify, where was the paralegal available to him at? I don't remember the name of the facility. I don't believe it was the Southern Idaho Correctional Institution, but it was a transition phase. He left the Kootenai County Jail, and he did go to what was an IDOC facility. Right, but was it at IDOC-RDU? It seems like a paralegal was available to him on a weekly basis while he was at the IDOC-RDU. He was, but again, that would have been more than 30 days after June 22nd of 2013, and after jurisdiction had been relinquished. Do you have any case law that would suggest that, for any reasons like you indicated, that there is, if you will, a tolling of the 30-day time period for grievance that would be that your client could rely upon in this situation? You've acknowledged that he didn't file on a timely basis. The only thing that sustains or saves your claims in any way is some kind of a tolling arrangement. Is that what you're arguing? No, I don't think it's a tolling. I don't think it's a tolling question. Equitable tolling, equitable something? I don't think it does. I don't think it does for the primary reason that it all comes down to whether or not the IDOC's grievance policy would have allowed him to have used a tolling arrangement. I'm not aware of anything, and the appellees have not raised anything as far as if he would not have been able to apply the grievance policy during that 30-day period, then he would have had tolling. What I'm struggling with here, counsel, is this. Regardless of the merits of your client's claims, he didn't file within the 30-day period that was required. So his claims aren't exhausted and there's no basis for filing unless you somehow overcome the 30-day problem. What I'm asking is on what basis are you overcoming that 30-day problem? I know you say he doesn't have it available in this other facility and so on, but is there any case law that you can rely on under the PLRA or anything comparable that would give us some leg to examine your claim and excuse, if you will, for not filing within the 30-day period? Yes, and again, as I said, I'm not aware of anything for tolling, and again, that's not the basis of our argument or position. But the case law would be this Court's en banc decision, Albino v. Baca, and the Supreme Court in Ross v. Blake, where in both instances they said that the remedy has to be available. And if the remedy is not available, you do not have to exhaust your remedies, and the PLRA's exhaustion requirement does not apply. Are those PLRA cases that you're citing? They are, I believe, yes. I want to clarify because it seems like Mr. Goldsby went to the county jail and then the IDOC RDU. Is that correct? That is correct. That's my understanding. It seems from my view that he should have filed once at the RDU. I'm trying to figure out why didn't he. I think he had access to the forms at the RDU, but maybe you can clarify my view on this. And so giving a little bit more of the facts, while he was in the Kootenai County Jail, he did attempt to pursue his grievance. He wrote to Deputy Warden Lutz, he requested grievance forms, and he received no answer. When he was moved to the RDU unit, my understanding is that there was a paralegal available on a weekly basis, but he did not have available to him at that time because he was in a transition, his legal papers or other information that he needed to prepare those grievance forms. As soon as he came from there, from the RDU unit, there was a time that he was on suicide watch and in other facilities where he didn't have adequate access to his own legal papers and to do the things that he found necessary to pursue his grievance. As soon as he got to the Southern Idaho Correctional Institution, very soon thereafter, within a week or less, he put in a concern form talking about the retaliation due to his termination. He then filed a grievance form. He then filed an appeal, and shortly thereafter he filed this lawsuit bringing his 1983 claims. And it's my understanding that he did do what he thought he could do. Yes, there was a paralegal available. But does the law require that he have his papers? I don't know that the law requires that he has his papers, but I don't think that the answer to the question would be any different if he had done something when he got to IDOC's RDU unit. He already was outside the 30 days. IDOC already would have said that he had not done this in a timely manner, and we would have had the same argument here today. So I don't think that that matters. When he was at Southern Idaho, he files an offender concern, filed that with the wrong person. That's denied. That's, I think, November 6th. He then files a grievance, and that was returned as untimely, but that grievance he filed attached the wrong offender concern. It attached the May one, correct? I would have to look at the record, but I have no reason to doubt you on that, Judge Gordon. And what I would say is obviously Mr. Lamont Goolsbee isn't as educated as maybe some of the rest of us are, and I do think that he was doing his best. But, again, anything that happened after, in my mind, August of 2013 would be irrelevant because at that point he's already excused from exhausting any available administrative remedies, which in this case they weren't available. And as I understand it, you acknowledge he didn't file in the 30-day period. By the time he got to the new facility, the 30-day period had expired, right? That is correct. Basically, the only remedy for you is if somehow that 30-day period gets covered in some way, and we have to figure that out. Just one final question, at least from my part, because your time is now up. If your client had his druthers, what exactly is he seeking at this point? What does he want? Well, the most immediate answer to that question, Your Honor, is we would like the district court's decision to be reversed, vacate the judgment, and remand. But understanding that that, I don't think, is the true answer to your question. No, it's not. My client wants to go back, and he wants to vindicate what he feels was his rights. He feels like he was wronged by the prison officials, and in particular, he was wronged when they determined to terminate him on the basis of what he believed, and I think had legitimate reasons. He wants a statement that he was wronged, or does he want to go back inside and be in prison again? No, he does not want to go back and be in prison again. In fact, before this case would ever be done, he will have served his full sentence. I think his full-term release dates July 11 of this year. Does he want an apology, essentially? I think that he will pursue all of his remedies. I think that he wants to know that he was wronged, that it was improper what they did to him, but also to seek any and all available damages. What might that be? Compensatory damages. In his mind, he should have been on probation earlier or on supervised release earlier than he was. It was a difference of about three years. Pain and suffering, the fact that he was racially discriminated against, he was terminated from a program because of his race and for seeking to use his first member. It's all of his allegations anyway, right? That's correct. Other questions by my colleagues? Thank you, counsel, for your argument. Thank you for your patience. So let's hear from the State. Good morning. Good morning. Please, the Court. Emily McMaster for the appellees. I had intended to start with discussing Heck v. Humphrey. What I'd like to do is address the Court's concerns. If Heck doesn't apply, how would that play out on the exhaustion argument first and then reserve some time at the end to talk about Heck? Let me just ask you, of course. Heck would apply if it were going to render his conviction or sentence invalid. I don't think that's what we're dealing with here. Do you agree? I disagree. Okay. Why is that? What's at issue in this case is the Court's August 2013 decision in judgment denying probation. If Mr. Lamont Goldsby had been granted probation at that time, we wouldn't be here today. And, in fact, in counsel's argument just now, he stated that if this were to go back down, he would seek all available remedies, including compensatory damages, for the denial of probation. And that puts it squarely within Heck v. Humphrey. So from the State's perspective, the August 2013 judgment denying probation indeed implicates the conviction or the sentence, and, therefore, Heck is triggered. End of story. Yes, that's correct, because due to that judgment, he received prison time instead of a lower level of custody in probation. And, in fact, paragraphs 47 through 49 of the amended complaint in the record at page 210 make clear that Mr. Lamont Goldsby's theory is it was Amanda Cashmere's testimony in the court at that hearing that convinced the Court to change its mind and deny probation. In paragraph 47, he alleges that as of July 11, 2013, Judge Gibler was considering probation. And the only thing that changed after that date was Amanda Cashmere's testimony on August 13, 2013. And at that point, the Court went ahead and denied probation. So that changed the sentence, right? According to the allegations in the complaint, yes. And which allegation was it again, please? Paragraphs 47 through 49 of the amended complaint at page 210 of the record. The complaint also makes clear that his theory of the case is that because he lost probation and had more prison time, that that was due to the recommendation, the amended pre-sentence investigation report, and Amanda Cashmere's testimony in August. And that's the theory of the case, and he pleads compensatory damages for that. And his first cause of action and second cause of action also state that claim, that they allegedly interfered and affected his ability to get probation. So on that stance, Peck v. Humphrey bars this case. Additionally, Edwards v. Balasag is actually one of our best cases on that position. In that case, the Supreme Court held that a prison disciplinary proceeding was at risk of being invalidated because of the allegations in the complaint, which was that there was alleged deceit and bias at that proceeding by the hearing officer. It's very close to say that whether the issue is in Heck v. Humphrey, alleged unlawful investigation, unlawful prosecution, unlawful procedures at trial, call into question the conviction, or in Edwards v. Balasag to say that an alleged bias and deceit in the hearing record because of allegations about the hearing officer render and call into question the decision at that proceeding. Here we have something very similar. The record before the court at the August 13, 2013 hearing included, first and foremost, Amanda Cashmetter's testimony, which was important, if not determinative, the Amanda PSI, and the recommendation of the Department. So for those reasons, Heck v. Humphrey bars proceeding in Section 1983 unless and until Mr. Lamont Goldsby seeks to overturn that sentencing judgment through habeas corpus. So that applies to level of custody as well, probation versus in-person custody or in prison custody. Yes, it does. And that was mentioned by Skinner, I think citing to the Dodson concurrence by Judge Scalia. It appears that Mr. Goldsby made a number of complaints and filed a number of inmate agreements forms about alleged discrimination prior to May of 2013. It also appears that his allegations of discrimination caused some tension between him and the employees at the IDOC, at least his instructors at Ms. Cashmetter. Also, there's a recommendation to the state court judge from the NIC employees They cited Mr. Goldsby's complaints about racism as being part of the problem holding him back from succeeding, it looks like, in the therapeutic community program. So I guess based on all this that was going on and the buildup between Mr. Goldsby and the staff at the NICI, do you agree that Mr. Goldsby's ultimate termination from the program may have been in part due to his allegations of discrimination? No, Your Honor, I do not. There's a couple points I can raise. First of all, the allegation of termination is not in the record. What's in the record is Mr. Goldsby's affidavit at summary judgment where he says that he was removed from the treatment community program, and I think it was on a Friday, perhaps the 21st or Saturday, the 22nd of June, from Tier 3 to Tier 4, and that's in the housing record as well. I can find the site for that if you'd like that. And he sat there over the weekend until he was transported to the jail on Monday for purposes of, we would assume, the review hearing that came shortly after. He was in the treatment community program on Tier 3. He had to be removed from that program so he could be transported to the jail. And the word removal is in his affidavit at summary judgment at page 100 of the record in paragraph 7. There's also language about a discharge summary. You get admitted into a program, you get discharged when you get transferred. And let's just assume that it was part of the basis for the termination from the program, just assuming arguendo it was. Wouldn't that also provide a basis for the termination constituting a separate act, basically, of a violation of his Equal Protection First Amendment rights under 1983 that would start a new 30-day clock? The removal from Tier 3, there's really nothing to that except for the transport. If the issue was that the recommendation to the court that came along at the same time was a new act, then that invokes the Huckabee Humphrey. It could start the time again. Let's assume that the Huckabee Humphrey does apply. Does it start the clock again? It does, doesn't it? If the issue was a recommendation to the court on or about June 21st or June 22nd, yes, it would start the clock again. Now, the June 22nd date is not even mentioned in the amended complaint. That did not come up until, I believe, argument later on at summary judgment, and it's been made into a larger alleged event during the appellate arguments, but it's not even in the amended complaint. I'm just going over this because Mr. Goldsby, he's pointed to IDOC materials that state that the IDOC offenders housed in county jails are subject to the procedures of those jails, and those county jails are not required to facilitate any kind of contact between the inmate and IDOC, including sending what they call those kites or grievances back and forth. So I'm just wondering, doesn't that create a situation which, while Mr. Goldsby was at the Kotani Jail, that he could not have started the grievance process for his termination from the NICI therapeutic community program on June 22nd? Your Honor, in the same jail manual that says that the jail won't affirmatively take action on your behalf, the jail will deal with grievances at the jail, at a different page in that same manual, there are instructions that if you have issues that you wish to raise with the Department of Correction to contact Matt Villard, and it provides the address and his name for that purpose, and that was available also in the manual that Mr. Lamont Goldsby relies on. So just in practical terms, what do you say that Mr. Goldsby should have done once he was transferred from the Kotani Jail to ensure that he exhausted his administrative remedies? Once he was at the Kootenai County Jail, what he should have done was write to Matt Villard and request a concerned form of grievance, and we know he had postage and was able to do that because he alleges that he sent a letter to the warden at North Idaho Correctional Institution. And I'm sorry, you may have just said this, but did he have access to the IDOC manual that listed Matt Villard as the jail liaison while at the Kootenai County Jail? On the record that we have before us, we have the manual, and we know it was the Kootenai County Jail's manual. I don't believe that he ever testified that he didn't have access to that. Counsel, could you give me the site on Edwards v. Balasag? I don't have that among the materials that I have here on the bench. You said it was a Supreme Court case, I think. Yes. Edwards is 520 U.S. 641. It's a 1997 case. 641? Yes. 19 what? 1997. Thank you. So just so I'm clear, Mr. Goldsby's attorney says there was no available remedy for him at the county jail, and so by the time he gets to the Idaho facility prison, the time had expired. Do you agree with that? Did he have available remedies while he was in jail? He had available remedies at the Idaho County Jail. That was to write Matt Vallard and request concern forms and start the process while he was there. Regardless, in any event, to address the Court's prior discussion, he's transferred back to the Department of Corrections custody on September 16th, and he's sent to the Idaho Correctional Institutional Center in Orofino for one day, and then he's transferred to the Idaho State Correctional Institution, which we call ISDI, where he's in the reception and diagnostic unit for a period of time, and that's south of Boise. And while he's there in the RDU unit, he has access to a paralegal. But the 30 days had already expired by then. The 30 days had already expired. What he should have done is bring a concern form, bring a grievance at that time. At what time? If he was at the RDU or even the first day he gets back to the Idaho Correctional Institution at Orofino. Would that have been returned as untimely? We don't know, but if he'd done that, he would have been positioned to say, I tried to exhaust my administrative remedies, and they were unavailable to me. He didn't even make that effort. He should have made the attempt. He also could have asked the warden or explained to the warden at that time, I didn't have access in the jail, and they would have had a chance to have that discussion at that time. If the warden wanted to provide an extension of time, the warden could. All of that's in the grievance policy generally. The warden has that authority to extend the time? Yes. There is an opportunity to extend time if that's requested, and in this case, it would have been if it had been timely requested, which it was not. So he waited more than 50 days, or excuse me, about 50 days, from September 16th until November 6th, 2013, to even make an attempt. But to circle back to my starting point, you believe that he had available remedies prior to August while he was still in Kootenai County Jail? That's correct, Your Honor. And the district court found a triable issue sort of indict on that point because the district court followed the Heckfrey-Humphrey analysis and said, in abstract, there might be a triable issue about what happened while he was at the jail. But in our brief on appeal, we answered by responding that on the record itself, the same manual that he's relying on to say that the jail wouldn't do anything for him, the same manual also says you can contact Matt LaPillard. Is it fair to say that your best argument is the Heckfrey-Humphrey argument? You don't even get into this because the reality is what he wanted to do was to change his sentence. Heckfrey-Humphrey steps in, end of story, from your perspective, right? Yes, that's correct, and I'm smiling because I thought that was my best argument until I heard your opening remark this morning. We can say whatever we want. I do believe that that's our best argument is that it's an impermissible, it risks a collateral attack on the state court judgment. The state court, after the sentencing and after hearing testimony by Amanda Cashmitter, considered what we call a Rule 35 motion and denied that. He appealed that to the Supreme Court of Idaho and then dismissed that appeal. At the same time, he also sought post-conviction relief from the state court, and he appealed that to the Court of Appeals and didn't go any further. His right remedy would have been to pursue those remedies and seek a federal habeas stating on the basis that he believed that the decision itself was tainted. The bottom line, Heckfrey-Humphrey is your first argument. The second argument is he had all that he needed to satisfy the timing involved and the grievance. He could have perhaps even asked for an additional extension of time. He didn't. Timing is barred 50 days. It's too late. End of story. Right? That's correct, Your Honor. Okay. Thank you. Other questions? Okay. Thank you very much. Thanks both to counsel. And again, we thank counsel for the appellant here. We realize being pro bono takes some time and so on, but it's very important to the administration of justice and the court thanks you. Thank you. And you too, counsel. We know you're in a different situation, but we thank you too.
judges: M. Smith, Murguia, Gordon